U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUL 26 2006

ROBERT H. SHEMWELL, CLERK
BY _____
            DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| ADANA MAYO, REGINA WADE AND SARA MAYO | : | DOCKET NO. 04-1014 |
| VS. | : | JUDGE TRIMBLE |
| RESEARCH ANALYSIS AND MAINTENANCE, INC. A/K/A RAM | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING

Before the Court are three (3) motions: (1) "Defendant's Motion for Summary Judgment against Plaintiff, Adana Mayo," (doc. #34) (2) "Defendant's Motion for Summary Judgment against Plaintiff, Sara Mayo," (doc. #30) and (3) "Defendant's Motion for Summary Judgment against Plaintiff, Regina Wade,"(doc. #32) wherein the defendant, Research Analysis and Maintenance, Inc. ("RAM") moves for summary judgment in its favor pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs oppose the motions.

## FACTUAL STATEMENT

Plaintiffs, Adana Mayo, Regina Wade, and Sarah Mayo, allege the following in their Petition. Plaintiffs were at all relevant times employed by RAM at its location at Fort Polk, Louisiana. In October 2001, RAM was awarded a government contract for control of the vehicle maintenance of the multiple integrative laser engagement systems. Adana Mayo was hired by RAM in 2003; Regina Wade began her employment in 1997 with Lockheed Martin, the predecessor subcontractor, and was retained by RAM when it took over the contract in 2001. Sarah Mayo began her employment in 1998 with Lockheed Martin and was retained by RAM also in 2001.

During the RAM contract, Woody Harrelson served as the site manager at Fort Polk.

Plaintiffs allege that beginning in 2002, Harrelson engaged in inappropriate conduct towards them. Specifically, Sara Mayo complains of the following conduct: Speaking to Sara about other women with whom he had relationships, using pejorative sexual terms to refer to female co-employees, repeated use of offensive, unprofessional, and obscene profanity, repeated comments about his own sexual prowess and sexual interactions with other women, pervasive sexually inappropriate and offensive emails, photographs, jokes and videos, inappropriate comments of a sexual nature, and inappropriate, sexually offensive touching.

Regina Wade complains of the following conduct by Harrelson: Inappropriate sexual comments concerning Regina's breasts, inappropriate touching of a sexual nature, repeated comments of a sexually explicit and inappropriate nature, throwing items into her cleavage, pursing his lips and blowing kisses to Regina, inappropriate comments about performing sexual acts on Harrelson, repeatedly telling her that he loved her, describing sexual activities with other women, repeated descriptions of his own sexual prowess, repeated use of sexually inappropriate, offensive and obscene profanity, circulation of emails, pictures, jokes, and videos of a sexually explicit nature.

Adana Mayo complains of the following conduct by Harrelson: Repeated use of extreme profanity including obscene profanity, inappropriate physical touching of Mayo, including pressing a cell phone up her buttocks, repeated descriptions of sexual interactions with other women, and Harrelson's repeated descriptions of his sexual prowess.

Plaintiffs allege that in late July 2003, they lodged a complaint to RAM through a Human Resources employee, Bethany Waldron, who was at Fort Polk. Plaintiffs complain of the following: Harrelson and RAM instituted a constructive layoff of Adana, reduced her hours to zero, failed to promote her to full-time, refused to include her in training classes, continued and ongoing threats to

her employment, and termination from employment. Harrelson and RAM retaliated against Regina Wade in the following manner: Following Regina around the workplace, providing her with a less favorable evaluation and performance reviews, transferring her out of the office and into the field, limiting her training which affected her opportunities for promotion, ostracizing her from co-employees, refusing to allow her to take her vacation time, imposing rules that only applied to her and Sara Mayo, moving her from one unit to another to prevent her from obtaining supervisor's pay, repeated threats to her job and constructive discharge. Regina also complains that she did not receive pay commensurate with other male employees in her position.

Harrelson and RAM retaliated against Sarah Mayo in the following manner: Issuance of a verbal disciplinary warning, less favorable performance reviews and evaluations, transfer out of the office and into the field, moving her into two different units in less than three months in order to interfere with her opportunity to train, ostracizing her from her fellow co-workers, refusing her vacation, following her and watching her in the performance of her job, limiting her time off in order to complete her schooling as a registered nurse and constructive discharge.

Adana asserts the following causes of action against RAM: (1) sexual harassment which created a hostile work environment in violation of Louisiana Revised Statute 23:332 *et seq.*, (2) retaliation in violation of Louisiana Revised Statute 51:2231 *et seq.*, (3) constructive discharge in violation of Louisiana Revised Statute 23:332 *et seq.*, (4) retaliation because she disclosed a workplace act or practice in violation of Louisiana Revised Statute 23:967, *et seq.*, and (5) failure to promote in violation of Louisiana Revised Statute 23:332.

Regina asserts the following causes of action against RAM: (1) sexual harassment which created a hostile work environment in violation of Louisiana Revised Statute 23:332 *et seq.*, (2)

3

retaliation in violation of Louisiana Revised Statute 51:2231 *et seq.*, (3) retaliation because she disclosed a workplace act or practice in violation of Louisiana Revised Statute 23:967, *et seq.*, and (4) failure to pay her an equal amount to male employees because of her sex in violation of Louisiana Revised Statute 23:332, *et seq.*

Sara asserts the following causes of action against RAM: (1) sexual harassment which created a hostile work environment in violation of Louisiana Revised Statute 23:332 *et seq.*, (2) retaliation in violation of Louisiana Revised Statute 51:2231 *et seq.*, and (3) retaliation because she disclosed a workplace act or practice in violation of Louisiana Revised Statute 23:967, *et seq.*

As a result of the alleged discrimination, retaliation and reprisal practiced by RAM, the Plaintiffs assert that they have suffered humiliation, embarrassment, loss of self esteem, extreme mental and emotional distress, as well as physical harm and injury.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[2] Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[3] The burden requires more than mere allegations or

---

[1] Fed. R.Civ. P. 56(c).

[2] *Vera v. Tue*, 73 F.3d 604, 607 (5th Cir. 1996).

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

4

denials of the adverse party's pleadings. The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[4] There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[5] If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[6]

On summary judgment, a court first must look to substantive law to determine the essential elements of a case and who has the burden of proof on each element.[7] "After consulting the applicable substantive law to determine which facts and issues are material, we review the evidence in the light most favorable to the non-movant relating to those issues."[8] Nonetheless, to preclude the entry of summary judgment, the non-movant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial.[9] Thus, "Rule 56(c) mandates the entry of summary judgment against a party who has failed to make an evidentiary showing sufficient to establish an essential element of her case."[10]

---

[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[5] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[6] *Anderson*, 477 U.S. at 249-50.

[7] *Anderson*, 477 U.S. at 249.

[8] *Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996).

[9] *Celotex Corp.*, 477 U.S. at 248.

[10] *Ward v. Bechtel Corp.*, 102 F.3d 199, 202 (5th Cir. 1997).

# LAW AND ANALYSIS

*Sara Mayo*

Sara asserts claims of sexual harassment and retaliation under Louisiana law. RAM maintains that it is entitled to judgment in its favor as a matter of law because the undisputed facts of this case show that Sara Mayo has no evidence to support the essential elements of her claims and she cannot carry her summary judgment burden of proof. Due to the similarities in Louisiana's anti-discrimination/harassment law and Title VII to the Civil Rights Act of 1964, federal courts routinely look to federal precedent in deciding state law claims of harassment.[11]

In *Casiano v. AT&T Corp.*,[12] the Fifth Circuit has outlined a roadmap to be followed in all cases alleging sexual harassment by a supervisor. The first step is to determine whether the complaining employee has or has not suffered a "tangible employment action."[13] If the court determines that the employee has suffered a tangible employment action, then the case is classified as a " *quid pro quo* case; if she has not, the suit is classified as a case of "hostile environment."[14]

In a *quid pro quo* case, the court must determine whether the tangible employment action actually resulted from her acceptance or rejection of the supervisor's alleged harassment.[15] If no such nexus is shown, then the employer is not liable for the supervisor's conduct.[16] If a nexus is proven,

---

[11] *LaDay v. Catalyst Technology Inc.*, 302 F.3d 474, 474 (5th Cir. 2002).

[12] 213 F.3d 278 (5th Cir. 2000).

[13] *Casiano*, 213 F.3d at 283.

[14] *Id.*

[15] *Id.*

[16] *Id.*

6

the employer is vicariously liable for the supervisor's behavior and cannot avail itself of the one and only affirmative defense provided in *Faragher v. City of Boca Raton*,[17] and *Burlington Industries v. Ellerth*.[18]

If the plaintiff cannot prove that she suffered a tangible employment action, the case is deemed to be a hostile environment case. The plaintiff has the burden of proving that the harassment was not only severe or pervasive, but also that it was based on the plaintiff's sex and that it altered the terms and conditions of the plaintiff's employment.[19] If the allegations of harassment are not sufficiently severe or pervasive or are not based on sex, then the employer is not liable for the supervisor's conduct.[20] If, however, the allegations are found to rise to an actionable level, the employer is entitled to assert the *Faragher/Ellerth* affirmative defense.[21]

The affirmative defense is comprised of two elements: (1) that the employer exercised reasonable care to prevent or correct promptly any sexual harassment; and (2) that the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.[22]

RAM argues first that Sara did not suffer a tangible employment action and the case should be analyzed as a hostile environment case. A tangible employment action is one which "constitutes

---

[17] 524 U.S. 775, 792 (1998).

[18] 524 U.S. 742 (1998).

[19] *Casiano*, 213 F.2d at 284.

[20] *Id.*

[21] *Id.* at 284.

[22] *Id.*, citing *Ellerth, supra* and *Faragher, supra*.

a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[23] Sara alleges that she was constructively discharged. To prove a constructive discharge, Sara must be able to establish through competent summary judgment evidence, that her working conditions were so intolerable that a reasonable person in her position would have felt compelled to resign.[24] Whether a reasonable employee would feel compelled to resign depends on the circumstances, with special consideration of the following non-exclusive factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (7) offers of continued employment on terms less favorable than the employee's former status.[25]

RAM argues that Sara has no evidence to establish a genuine issue of fact as to whether she experienced any of the seven factors outlined above. RAM further argues that Sara was forced to resign because her schedule conflicted with her nursing school clinical rotations. Being unable to complete her nursing school clinicals, Sara tendered a letter of resignation to RAM on or about May 17, 2004.[26] Sara denies that she voluntarily resigned her employment in May 2004, and argues that RAM constructively discharged her by refusing to allow her to work part- time to accommodate her nursing school clinical schedule. Sara submits evidence that RAM accommodated another employee,

---

[23] *Ellerth*, 524 U.S. at 482.

[24] *Thompson v. Naphcare, Inc.*, 2004 U.S. App. LEXIS 23697, *14 (5th Cir. 2004).

[25] *Id.* at 20; see also *Mowbray v. American Gen'l Life Companies*, 2006 U.S. app. LEXIS 996, *12 (5th Cir. 2006).

[26] Exhibit 12, Defendant's Motion for Summary Judgment.

Shawn McMahon, who was enrolled in the exact same program as Sara, and allowed that employee to work part-time. A jury could reasonably conclude that RAM's decision not to accommodate Sara, while choosing to accommodate another employee similarly situated, forcing Sara to resign, is a tangible employment action.

The next step in the analysis is to determine whether the tangible employment action actually resulted from her acceptance or rejection of Harrelson's alleged harassment.[27] If no such nexus is shown, then the employer is not liable for the supervisor's conduct.[28] To constitute an actionable claim of hostile environment sexual harassment and "to succeed on a constructive discharge claim, the plaintiff must show a greater degree of harassment than is required for a hostile environment claim."[29] The first instance of harassment occurred in 2002, and the second and third instances in the summer of 2003. Sarah lodged the sexual harassment complaint to Bethany Waldron on July 30, 2003. The following week RAM sent its ombudsman to investigate the claims. Shortly after the investigation RAM formally reprimanded Harrelson. As a result of the remedial action taken by RAM, no further complaints were lodged against Harrelson by anyone.[30] Sara resigned in May 2004 and re-applied for employment at RAM one month following her resignation. The Court must

---

[27] *Casiano*, 213 F.3d at 283.

[28] *Id.*

[29] *Davis v. Potter*, 2005 U.S. Dist. LEXIS 33794, *29 (W.D. La. – Shreveport Division 2005), citing *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998).

[30] In May 2004, RAM sent a representative back to Fort Polk for the specific purpose of conducting a follow-up investigation. The report showed that Harrelson changed his behavior following RAM's investigation into his conduct on the jobsite. Indeed, nearly all of the employees who were interviewed informed the RAM representative that since August 2003, Harrelson showed a definite improvement in the way that he dealt with employees and that his "hostile tone and associated threats have all but been eliminated." Defendant's Exhibit 10.

determine whether the constructive discharge suffered by Sara resulted from her acceptance or rejection of Harrelson's alleged sexual harassment.[31] Even though the Court has determined that there is a genuine issue of material fact as to whether Sara was constructively discharged, that discharge cannot be said to have been caused by Harrelson's alleged sexual harassment. There is no evidence of Harrelson sexually harassing Sara after August 2003, when he was reprimanded. Thus, it cannot be said that Harrelson's sexual harassment caused Sara to resign. Accordingly, the Court finds that there is no nexus or connection between Sara's constructive discharge and the sexual harassment claims.

Sara also alleges that RAM retaliated against her in violation of state law because she complained about Harrelson's alleged sexual harassment. RAM argues that Sara's claim must fail because she cannot establish a *prima facie* case of retaliation. To prove retaliation, an employee must prove: (1) the employee engaged in a protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action.[32] RAM does not dispute that Sara engaged in a protected activity, but argues that she did not suffer an adverse employment action because she resigned in order to complete her nursing clinicals. Sara maintains that she was issued a verbal disciplinary warning, received less favorable performance reviews and evaluations, and RAM refused to accommodate her school schedule – something it had done for the entirety of her employment, and at the same time RAM accommodated Shawn McMahon by allowing him to work part-time so that he could take the same classes that Sara was taking. By this refusal to accommodate her school

---

[31] *Ellerth*, 524 U.S. at 753-54.

[32] *Mattern v. Eastman Kodak*, 104 F.3d 702, 705 (5th Cir. 1997), *cert. denied*, 522 U.S. 932 (1997).

schedule, Sara argues that RAM forced her to resign resulting in a constructive discharge.

In *Burlington Northern and Santa Fe Railway Co. v. White*,[33] the Supreme Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[34] The Court further stated the following:

> The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.
> 
> We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.
> 
> ***
> 
> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children.[35] A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others." (Citations omitted)

Sarah was about to begin her clinical nursing training and had asked her supervisor, Shannon

---

[33] 548 U.S. ___, 2006 U.S. Lexis 4895(2006).

[34] Citing *Roshon v. Gonzales*, 438 F.3d 1211, 1219 (CADC 2006).

[35] Cf., *e.g., Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, 663 (CA7 2005)(finding flex-time schedule critical to employee with disabled child).

11

Midkiff about part-time work. Midkiff informed Sara that she would have to resign (even though RAM accommodated her co-worker and classmate, Shawn McMahon). Sara resigned in order to complete her nursing training. Sara has submitted summary judgment evidence sufficient to create a genuine issue of material fact for trial as to whether she was constructively discharged in retaliation for filing a sexual harassment complaint against her supervisor.

*Regina Wade*

Regina asserts claims of sexual harassment, retaliation and gender discrimination. Following the *Casiano* roadmap, the Court must first determine if Regina suffered a "tangible employment action" which would result in the case being classified as a *quid pro quo* case.[36] RAM argues that Regina received no decrease in her compensation or in her job responsibilities, nor was she fired from her job or demoted. Regina asserts that she was constructively discharged and submits the following issues of material fact: In early 2004, Regina was informed that her husband was being deployed to Iraq. She made a request to RAM to allow her to come to work later, instead of 6:30 a.m. to allow her time to get her child to daycare – a task her husband normally performed. Harrelson and Arliss Garner, Harrelson's second in command, failed to accommodate Regina's request. Garner told Regina that he "didn't make [her husband] sign on the dotted line" to join the military.[37] Garner also informed her that Harrelson was not going to work with her because of the lawsuit.[38] Regina took her request to corporate requesting permission to report to work 30 minutes late (and make it up at lunch time). Bethany Waldron initially told Regina that she would be

---

[36] 213 F.3d at 283.

[37] Plaintiffs' Opposition to Motion for Summary Judgment, Exhibit 3, p. 214.

[38] *Id.*

12

accommodated. Regina was out on medical leave with kidney stones from June 8, 2004 until July 15, 2004 and worked light duty from July 15, 2004 until August 16, 2004. While Regina was on medical leave, RAM's approach changed. E-mails at the corporate level suggest that RAM was preparing to terminate Regina's employment while she was on light duty. Bethany began to document Regina's working hours and review her doctors' excuses. Bill Smolak, the Human Resources Director for RAM, complained that Harrelson and Garner failed to forward him documentation of counseling sessions with Regina. In June 2004, Bethany stated to Smolak that Regina's requests were not "way off the course of reasonable," considering accommodations regularly granted to college students at Fort Polk, and that "we absolutely cannot trust Woody/his motives in this case."[39] The following excerpt from an e-mail sent from Bethany to Bill Smolak on June 14, 2004 further indicates RAM and Harrelson's intention towards Regina:

> Well, I have a different perspective on Woody's [Harrelson] suggestion of the part-time status. I suspect that Woody has a different motivation other than helping in asking Regina to be a part time employee. Since part-time employees are not guaranteed a regular work schedule/specific hours, I would suspect it is his intention to essentially get rid of her [because he wouldn't have to schedule her for work]. Personally, I believe it is a really bad idea. I hate to say it but we absolutely cannot trust Woody/his motive in this case. I have zero confidence that Woody and Arliss can be trusted to schedule her as they would the rest of the part-time employees [given their track record with her].[40]

Regina argues that Harrelson engaged in badgering, harassment and humiliation of her – so much so that she suffered stroke-like symptoms from the stress. While she was out on leave, Harrelson called her to ask if she was going to return to work or quit.[41] When she returned from

---

[39] Plaintiffs' Opposition to Motion for Summary Judgment, Exhibit 13, p. 362.

[40] Plaintiffs' Opposition to Motion for Summary Judgment, Exhibit 13, DPTP 0361.

[41] Plaintiffs' Opposition to Motion for Summary Judgment, Exhibit 3, p. 254.

13

medical leave, Regina was informed that she would have to follow her regular work schedule without accommodations for her child care issues. Regina received four warning notices for tardiness and was informed by Harrelson that she was being recommended for termination. On August 31, 2004, Regina maintains that she resigned so that she would not have a discharge on her record. Regina has presented sufficient evidence to create a genuine issue of material fact for trial as to her having suffered an adverse employment action. Next, the Court must determine whether the constructive discharge suffered by Regina resulted from her acceptance or rejection of Harrelson's alleged sexual harassment.[42] Even though the Court finds that Regina suffered a tangible employment action, Regina has submitted no summary judgment evidence to create a genuine issue of material fact that her discharge was connected to the alleged sexual harassment. There is no evidence of Harrelson sexually harassing Regina after August 2003, when he was reprimanded. Thus, it cannot be said that Harrelson's sexual harassment caused Regina to resign. Accordingly, the Court find that there is no nexus between the alleged constructive discharge and the sexual harassment claim. However, the Court does find that Regina has submitted sufficient evidence to create a genuine issue of material fact as to whether she was constructively discharged in retaliation for her filing a sexual harassment complaint against her supervisor, Harrelson.

Finally, Regina asserts a claim of gender discrimination alleging that she was paid less than her male counterparts for performing the same job. To prove a claim of gender discrimination, Regina must present competent summary judgment evidence as to each of the following elements: (1) that she is a member of a protected class; (2) that she was qualified for the position; and (3) that she suffered an adverse employment action; and (4) either that she was replaced by someone not in

---

[42] *Ellerth*, 524 U.S. at 753-54.

the protected class or others similarly situated were treated more favorably.[43] It is not disputed that Regina is a member of a protected class.

Regina was promoted from a Tech I to a Tech II in June 2002. Regina alleges that she was performing the duties of a Tech III, and as such, was qualified for the pay and/or position of a Tech III. She further alleges that all male employees performing Tech III duties were treated more favorably because they received Tech III pay.

Regina testified that when she was moved into the office, she scheduled employees subordinate to her and conducted evaluations. She testified that Garner informed her she would help him supervise the warehouse employees. Regina asserts that she assisted in evaluations and created schedules, functions only Tech III's had the authority to perform. Regina complains she was paid Tech II pay, but was entitled to Tech III's pay rate.

RAM submits undisputed evidence that Regina took the Tech III test and failed it, and further asserts that she was not interested in Tech III status. RAM submitted evidence that Regina's responses on the test were largely comprised of "I don't know" and "I don't care."[44] Furthermore, Regina testified she did not expect Tech III pay for the job duties that she would be doing assisting Garner in the office.[45] Because she has failed to establish that she was qualified for the Tech III position, Regina cannot establish the necessary elements of a gender discrimination claim.

*Adana Mayo*

Adana Mayo asserts claims of sexual harassment, retaliation and failure to promote under

---

[43] *Okoye v. Univ Of Texas Houston Health Sciences Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

[44] RAM Exhibit 6 and Exhibit 11.

[45] RAM Exhibit 6, p. 154.

15

Louisiana law. The first step of the analysis for the sexual harassment claim is to determine if Adana suffered a "tangible employment action."[46] The Supreme Court in *Faragher* and *Ellerth* require the complaining employee to not only establish the existence of a tangible employment action, but also to show that the adverse action "resulted from" the employee's acceptance or rejection of the alleged harassment.[47] The Fifth Circuit described the standard as requiring the plaintiff to prove a causal "nexus" between the so-called "harassment" and the claimed adverse action.[48]

RAM argues that Adana was terminated as a direct result of her own inappropriate behavior in the workplace and, in particular, inappropriate behavior directed at RAM's customer – the Army. Adana denies that the conduct that provoked her termination ever took place.

Adana lodged her complaints of sexual harassment to Bethany Waldron on July 29, 2003 via a telephone conversation. Bethany immediately forwarded the complaints to other RAM officials, including her supervisor, Anson Schulz. Schulz informed Harrelson of the allegations of sexual harassment on August 5, 2003. RAM's investigation took place between August 6-8, 2003. Many of the Plaintiffs' allegations were corroborated by the investigator. The investigator concluded that "RAM employees have either witnessed or experienced various types of harassment by Mr. Harrelson, which includes inappropriately touching female employees, inappropriately threatening termination of employees jobs and using insulting and degrading language in the workplace."[49]

On August 13, 2003, Harrelson received a letter of reprimand. On August 14, 2003 Harrelson

---

[46] *Casiano*, 213 F.3d at 283.

[47] *Ellerth*, 524 U.S. at 761; see also *Casiano*, 213 F.3d at 283.

[48] *LaDay v. Catalyst Technology, Inc.*, 302 F.3d 474, 482 (5th Cir. 2002).

[49] Plaintiffs' Opposition to Motion for Summary Judgment, Exhibit 9, pp. 49-50: Exhibit 15 p. 907.

held a meeting with his employees and told them he had been cleared of all charges, he would be the manager "until hell freezes over,"[50] and instructed the employees not to go to Bethany Waldron for anything.[51] That same day, after the meeting, Adana received an unsigned wholly negative employee performance evaluation that was placed in her file. Also, that same day, Harrelson sent Adana home in a layoff reducing her hours to zero from August 14, until September 29, 2003.[52] No other part-time employees were laid off.

Adana returned to work on September 30, 2003 until October 2, 2003 when she was once again laid off.[53] Adana returned to work on November 15, 2003. On November 19, 2003 two soldiers filed written statements of sexual harassment against Adana.[54] No ombudsman from RAM investigated the allegations of sexual harassment. Adana was terminated on November 20, 2003 because of the sexual harrasment allegations made by the two soldiers. Adana denies that she made any of the statements alleged by the soldiers. No investigation was conducted, and although there were allegedly eight or nine other soldiers that witnessed the allegations of sexual harassment, there is no evidence in this record to corroborate the two soldiers' statements. Anson Shultz admits that he immediately terminated Adana as a result of these allegations and did not order an investigation.[55]

As to the claims of sexual harassment against Harrelson, Adana was temporarily laid off by

---

[50] Plaintiffs' Opposition to Motion for Summary Judgment, Exhibit 5, pp. 199-200.

[51] *Id.*

[52] Plaintiffs' Opposition to Motion for Summary Judgment, Exhibit 7, p. 152.

[53] Plaintiffs' Opposition to Motion for Summary Judgment, Exhibit 7, p. 180.

[54] Defendants' Motion for Summary Judgment, Exhibits 12 and 13.

[55] Defendants' Reply to Plaintiffs' Opposition, Anson Shulz deposition, pp. 134-136.

having her hours reduced to zero, while other part-time employees were allowed to stay on the payroll and train to retake a test. Five days after returning to work from the second lay-off, she was terminated for allegations of sexual harassment.

The Court finds that it is highly suspect that (1) there was no investigation to corroborate the statements made by the two soldiers, (2) Adana was not interviewed, (3) none of the other soldiers that were allegedly present when the statements by Adana were made, were questioned, and (4) no investigation was conducted at all by RAM. There is a genuine issue of material fact for trial as to whether Adana's termination was a tangible employment action. The Court must determine whether the termination suffered by Adana resulted from her acceptance or rejection of Harrelson's alleged sexual harassment.[56] Even if the fact finder were to determine that Adana had been falsely accused of these allegations, and Adana suffered a tangible employment action, there is no nexus between her termination and the claims of sexual harassment against Harrelson. In other words, her rejection of any sexual advances did not cause her to be terminated. However, the Court does find that Adana has created a genuine issue of material fact for trial as to her claim of retaliation.

Adana also makes a claim of failure to promote. To establish a *prima facie* case in a failure to promote case, the employee must demonstrate: (1) that the employee is a member of the protected class, (2) that he sought and was qualified for the position, (3) he was rejected for the position, and (4) that the employer continued to seek other applicants with the plaintiff's qualifications.[57] Adana testified that on or about July 28, 2003, she applied and was tested for the full-time Tech I position when she was a part-time employee. Adana was the only female who took the test. After the test,

---

[56] *Ellerth*, 524 U.S. at 753-54.

[57] *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004).

Harrelson held a meeting with all the part-time employees who took the test and informed them that everyone performed poorly on the test and that no one would be promoted. Even though Harrelson refused to let Adana see her test, Adana testified that she was informed by George Sheppard that she scored 17 out of 20 on the written test – the highest score. She further testified that the Tech IIIs who administered the hands-on portion of the test told her she performed excellent on the test.[58] Bethany testified that all of the part-time techs missed at least half of the questions.[59] Bethany further testified that for the hands-on testing, no documentation was provided, yet she indicated in her testimony that normally such documentation is provided.[60] Adana was laid off on August 14, 2003. During her layoff, the other part-time employees were allowed to take training classes. Because of the layoff, Adana was not able to participate in the training classes. After the training classes, Adana maintains that RAM promoted Tony Prewitt. RAM argues that because Adana cannot prove that she scored high enough to warrant promotion on the exam, her claim must fail. Neither the written test nor the results of the hands-on test has been submitted into the record. Accordingly, there is a genuine issue of material fact as to Adana's failure to promote claims.

## CONCLUSION

Based on the foregoing, the motion for summary judgment filed by defendant Research Analysis and Maintenance, Inc. against Sara Mayo will be granted in part and denied in part. The motion to dismiss Sara's claim of sexual harassment will be granted; the motion to dismiss the claims of retaliation will be denied. The motion for summary judgment filed by RAM against Regina

---

[58] Plaintiffs' Opposition to Motion for Summary Judgment, Exhibit 7, pp. 138-140.

[59] Defendants' Motion for Summary Judgment, Exhibit 23, p. 272.

[60] *Id.* at p. 273.

19

Wade will be granted in part and denied in part. The motion to dismiss Regina's claim of sexual harassment will be granted; the motion to dismiss the claims of retaliation will be denied; the motion to dismiss Regina's gender discrimination claim will be granted. The motion for summary judgment filed by RAM against Adana Mayo will be granted in part and denied in part. The motion to dismiss Adana's claim of sexual harassment will be granted; the motion to dismiss the claim of retaliation will be denied; and the motion to dismiss the failure to promote will be denied.

The Court determines that there is no just reason for delay and will direct entry of final judgment under rule 54(b) of the Federal Rules of Civil Procedure.

THUS DONE AND SIGNED in Chambers at Alexandria, Louisiana, this 26 day of July, 2006.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE
FOR
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE